UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------------x
YESA LLC, as successor-in-interest to MANTIFF
MANAGEMENT, INC.,

                  Plaintiff,

  -against-

RMT HOWARD BEACH DONUTS, INC., ADR CONSULTANTS
INC., AMITA D. GANDHI, and DHIREN GANDHI,

                  Defendants.
-------------------------------------------------------------------------------x
RMT HOWARD BEACH DONUTS, INC., ADR CONSULTANTS
INC., AMITA D. GANDHI, and DHIREN GANDHI,

                  Third-Party Plaintiffs,

  -against-

MANTIFF MANAGEMENT INC. and FALGUN DHARIA,

                  Third-Party Defendants.
-------------------------------------------------------------------------------x

**Memorandum of Decision & Order**
15-cv-5936 (ADS)(SIL)

<u>APPEARANCES:</u>

**Genova Burns LLC**
*Attorneys for the Plaintiff and Third-Party Defendants*
494 Broad Street
Newark, NJ 07102
     By:    Rajiv D. Parikh, Esq., Of Counsel

**Law Offices of Leo W. Fraser, III**
*Attorney for the Defendants/Third-Party Plaintiffs*
444 Park Avenue, 9th Floor
New York, NY 10022

**SPATT, District Judge:**

       On October 15, 2015, the Plaintiff Yesa LLC ("Yesa"), purportedly as the successor-in-interest to Mantiff Management, Inc. ("Mantiff"), commenced this diversity fraud and breach of contract action by filing a summons and complaint (the "Main Complaint") against the Defendants RMT Howard Beach Donuts, Inc. ("RMT"); ADR Consultants, Inc. ("ADR"); Amita D. Gandhi

1

("A. Gandhi"); and Dhiren Gandhi ("D. Gandhi," collectively with RMT, ADR, and A. Gandhi, the "Defendants").

On January 28, 2016, the Defendants filed a document entitled "Answer to Complaint by [Defendants], Affirmative Defenses, Counterclaim, and Third-Party Complaint" (the "Third Party Complaint"). As described more fully below, the Third-Party Complaint purports to assert claims against Yesa, Mantiff, and their common principal Falgun Dharia.

Presently before the Court is a motion by Yesa, Mantiff, and Dharia (collectively, the "Movants"), pursuant to Federal Rule of Civil Procedure ("FED. R. CIV. P.") 12(b)(6), to dismiss the Third-Party Complaint on the ground that it fails to state a claim for which relief may be granted.

For the reasons that follow, the motion to dismiss is granted in part and denied in part.

### I.   BACKGROUND

Unless otherwise noted, the following facts are drawn from the Main Complaint and the Third-Party Complaint. They are construed in favor of the Defendants.

**A.   The Parties' History as Dunkin Donuts Franchisees**

In mid-1999, A. Gandhi and Dharia, who are cousins, owned, respectively, 90% and 10% of the stock of RMT, a domestic corporation with offices in Glen Oaks.

On May 26, 1999, RMT acquired a Dunkin Donuts store location in Howard Beach (the "Howard Beach Store") by way of an asset sale.

On the same date, RMT entered into a five-year franchise agreement to operate a Dunkin Donuts franchise from that location.

Allegedly, at or about this time, Dharia had similar interests in more than 40 Dunkin Donuts franchises in New York and New Jersey.

However, in September 2000, Dunkin Donuts allegedly decided to terminate Dharia's franchises due to alleged wage-and-hour and tax violations, which were deemed to be material breaches of the company's standard franchise agreement.

Thus, on September 28, 2000, Dunkin Donuts allegedly filed an action in a New Jersey state court to terminate the company's franchise relationship with Dharia.

On November 19, 2001, the lawsuit allegedly resulted in a confidential settlement agreement (the "2001 Settlement"). In relevant part, the 2001 Settlement allegedly required Dharia to divest himself of any remaining ownership interests he had in Dunkin Donuts franchises, and prohibited him from acquiring any future interests in the Dunkin Donuts franchise system.

B.   The Consulting Agreement

Approximately two months later, on January 10, 2002, attorneys for Dharia prepared a contract that is at the heart of this case. The Court will refer to this contract as the "Consulting Agreement."

The parties to the Consulting Agreement were RMT, of which Dharia was a minority owner, and Mantiff, a New Jersey corporation of which Dharia was the managing member.

The Consulting Agreement called for Mantiff, through Dharia, to provide to RMT certain consulting services – presumably consulting related to the operation of the Dunkin Donuts franchise at the Howard Beach Store – in exchange for specified sums of money.

This compensation allegedly took the form of profit-sharing in that Mantiff, by and through Dharia, was to receive a monthly payment of $866 plus 50% of the net monthly profits generated by the Howard Beach Store. Of importance, this arrangement was substantially similar to the parties' existing practice of allocating the profits of the Howard Beach Store on a 50/50 basis despite the fact that Dharia was a minority shareholder.

At the time of its drafting in January 2002, the Consulting Agreement was signed by Dharia, on behalf of Mantiff, and A. Gandhi, on behalf of RMT. However, by its terms, the agreement would not go into effect until such time as Dharia sold his ownership interest in the Howard Beach Store, as required by the 2001 Settlement.

Stated otherwise, the Consulting Agreement went into effect simultaneously with the anticipated transfer of Dharia's ownership interest, ensuring that Dharia's receipt of the financial benefits of a franchisee would continue uninterrupted.

Thus, according to the Third-Party Complaint, the Consulting Agreement was simply a tool by which Dharia fraudulently maintained the financial benefits of a Dunkin Donuts franchise, despite being banned from actual involvement in the franchise system after the 2001 Settlement.

Further, the Third-Party Complaint alleges that A. Gandhi was not presented with copies of the Consulting Agreement before being asked to sign it; was not advised that the letter and spirit of the Consulting Agreement were inconsistent with the terms of the 2001 Settlement; was not represented by counsel during this process; and was denied a copy of the agreement even after she signed it.

In this regard, it is alleged that:

> 51. Dharia had [A. Gandhi] go to his attorney's [Algios] office and execute the Consulting Agreement and related documents. [A. Gandhi] was not represented by counsel and she did not read the documents before signing them. She signed them because Dharia told her to sign them in connection with Dharia's transferring his ten percent (10%) in RMT Howard Beach to [A. Gandhi].
>
> 52. Over the years, [A. Gandhi] made numerous demands for copies of the documents which she executed at Algios' office, but Dharia refused to give her copies of the documentation.
>
> 53. After executing the documents at Algios' office, [A. Gandhi] continued to pay Dharia 50% of the profits, because Dharia asserted he was still an owner and kept telling [A. Gandhi], falsely, that he had invested money in the store.

TPC ¶¶ 51-53.

On March 19, 2003, pursuant to the 2001 Settlement, Dharia resigned from RMT and transferred his 10% interest in the Howard Beach Store to A. Gandhi, making her the sole owner of that franchise "on paper." Dunkin Donuts allegedly approved of this transaction without knowledge of the Consulting Agreement or Dharia's continued involvement as a "consultant" for the franchise.

4

On August 26, 2004, the original five-year franchise agreement between RMT and Dunkin Donuts expired. Apparently still unaware of the Consulting Agreement, Dunkin Donuts agreed to renew its relationship with RMT, and, to that end, executed a new, fifteen-year franchise agreement that would extend until May 2019. The franchise agreement, as well as the underlying ground lease for the Howard Beach Store, was eventually further extended through 2029.

C.     The Relevant Time Period: 2007 to 2013

The parties' pleadings offer sharply contrasting versions of the events that transpired between 2007 and 2013.

1.     The Gandhis' Allegations: A Business Loan Arrangement

The Gandhis allege that in March 2003, they invested $350,000 in various business ventures in which Dharia or companies he controlled were involved. Thereafter, beginning in 2004 and continuing to 2007, the Gandhis allegedly demanded that Dharia repay their investment.

The Gandhis further allege that Dharia acknowledged his indebtedness, and, in 2007, in order to repay them, agreed to forfeit his right to receive 50% of the net profits of the Howard Beach Store, which was due to him under the Consulting Agreement. Instead, he allegedly consented to the Gandhis applying these sums to incrementally satisfy his debt.

This practice allegedly continued from 2007 to 2013, throughout which time Dharia never demanded payment or otherwise sought to enforce the Consulting Agreement. Nevertheless, Dharia allegedly requested that he receive Form 1099s reflecting his share of the profits.

Thus, throughout this time, the Gandhis, by and through ADR, another corporation that they owned and operated, issued 1099s to Dharia and his corporations purporting to show the sums that were due under the Consulting Agreement. These tax documents, which are attached to the Main Complaint, reflect the following pertinent information:

5

| Year | Payor | Payee | 1099 Income Reported |
|------|-------|-------|----------------------|
| 2008 | ADR | Mantiff/Dharia | $58,196 |
| 2009 | ADR | Mantiff | $53,384 |
| 2010 | ADR | Yesa | $58,000 |
| 2011 | ADR | Yesa | $61,196 |
| 2012 | ADR | Yesa | $68,000 |
| 2013 | ADR | Mantiff | $84,000 |

*See* Main Compl., Ex. "A."

Although the record does not contain a Form 1099 for the 2007 tax year, the Main Complaint alleges that Mantiff was owed an additional $57,197 under the Consulting Agreement for 2007.

On April 4, 2014, A. Gandhi received and read for the first time a copy of the Consulting Agreement. After that, neither the Gandhis nor their corporations made any further payments to Dharia.

2.  **The Movants' Allegations: A Breach of Contract**

The Movants assert that Dharia and his corporations were not paid the amounts due under the Consulting Agreement between 2007 and 2013. However, they dispute the Gandhis' theory that these payments were withheld pursuant to a valid loan repayment arrangement.

The Movants appear to contend that the Consulting Agreement was a legitimate services contract, and not a surreptitious profit-sharing agreement of the type described by the Defendants. They allege that, in 2007, Mantiff assigned its right to payment under the Consulting Agreement to Yesa, which, as noted above, is also owned and controlled by Dharia.

Although the reasons for this assignment are not clear, between 2007 and 2013, Dharia allegedly continued to perform consulting services for RMT pursuant to the Consulting Agreement, for which he received the Form 1099s described above.

Nevertheless, Dharia maintains that neither ADR nor RMT ever actually paid for his bona fide consulting services. In this regard, it is alleged that none of the $382,776 reportedly paid to

Dharia's corporations between 2008 and 2013 was, in fact, paid. Further, of the $57,197 due under the Consulting Agreement for tax year 2007, only $3,499 was actually paid.

Despite not receiving the reported payments, Dharia's corporations allegedly filed the Form 1099s and were assessed the corresponding amount of income taxes.

According to Dharia, after numerous demands for the payments due under the Consulting Agreement, Dharia and the Gandhis – acting on behalf of Yesa and RMT, respectively – allegedly agreed in principle to the terms of a negotiated settlement.

To that end, substantive discussions throughout September and October of 2014 resulted in a proposed written agreement. Pursuant to the terms of the proposed settlement agreement, the Gandhis agreed to pay Dharia a total of $700,000, with $100,000 due at the time of signing, and the remaining $600,000 to be paid in 60 monthly installments.

However, despite indicating that these terms were agreeable to them, the Gandhis ultimately declined to sign the agreement and failed to respond to any further communications made on Yesa's behalf.

### 3. The Parties' Claims Arising from this Time Period

Each party's pleading asserts claims based on their own version of the facts.

By way of the Main Complaint, Yesa, purportedly as the assignee of Mantiff's contract rights, seeks to enforce the Consulting Agreement. In this regard, Yesa alleges causes of action sounding in: (1) breach of contract; (2) unjust enrichment; and (3) fraudulently filing tax returns.

By way of the Third-Party Complaint, the Gandhis and their corporations allege causes of action sounding in: (1) fraudulent inducement; (2) fraudulent procurement of monies; (3) unjust enrichment; and (4) failure to repay monies admittedly owed. They seek to void the Consulting Agreement and recoup any profits of the Howard Beach Store that they were fraudulently induced to pay over to Dharia.

7

D.     **Subsequent Proceedings**

Apparently, the Consulting Agreement in this case was one of several similar agreements that Dharia executed as a way of allegedly attempting to preserve hidden interests in the Dunkin Donuts franchise system in the wake of the 2001 Settlement.

Thus, in December 2013, Dharia, on behalf of Mantiff, commenced two consolidated actions in a New Jersey state court to enforce similar consulting agreements against the franchisees of Dunkin Donuts stores in the towns of Emerson and Fairview.  The defendants in those actions asserted that the consulting agreements were the product of fraud, and sought to recover damages from Dharia and the attorney who prepared the documents.

Dunkin Donuts intervened as a party in those actions, seeking to void the consulting agreements on the ground that they ran counter to the 2001 Settlement.

On October 28, 2013 and April 16, 2014, Dharia, on behalf of Mantiff and/or Yesa, also commenced civil actions in the Nassau County Supreme Court to enforce the terms of consulting agreements executed by franchisees of Dunkin Donuts stores in Merrick, Rockville Centre, Oceanside, and Port Jervis.  The defendants in those actions also asserted fraud as a basis for voiding the consulting agreements, and sought to recover monetary damages against Dharia and his attorney.

Apparently unrelatedly, on August 14, 2014, Dharia pled guilty in this District to two counts of bank fraud; one count of making a false statement in a tax return; and one count of obstruction of justice.  On September 1, 2015, in a separate matter, Dharia also pled guilty to one count of conspiracy to commit mail fraud.

He is awaiting sentence on all charges.

II.     DISCUSSION

A.     **Standard of Review**

Under FED. R. CIV. P. 8(a)(2), a pleading that states a claim for relief must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."   The pleading

standard announced in Rule 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* at 678 (quoting *Twombly*, 550 U.S. at 555).

Rather, to survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). The "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 557.

Furthermore, claims based on fraud are subject to the heightened pleading standard found in FED. R. CIV. P. 9(b). In particular, a party asserting fraud "must state with particularity the circumstances constituting fraud or mistake." FED. R. CIV. P. 9(b). "Rule 9(b) is satisfied when the complaint specifies 'the time, place, speaker, and content of the alleged misrepresentations;' how the misrepresentations were fraudulent; and the details that 'give rise to a strong inference that the defendant[ ] had an intent to defraud, knowledge of the falsity, or a reckless disregard for the truth.'" *Schwartzco Enters. LLC v. TMH Mgmt., LLC*, 60 F. Supp. 3d 331, 344 (E.D.N.Y. 2014) (Spatt, J.) (quoting *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 359 (2d Cir. 2013)).

With these standards in mind, the Court will now turn to the parties' substantive contentions.

B.   As to Whether the Third-Party Complaint States Plausible Fraud-Based Claims

The first and second causes of action in the Third-Party Complaint allege that Mantiff and Dharia perpetrated a fraud against the Defendants by knowingly withholding from them certain material facts regarding the Consulting Agreement. Chief among these alleged omissions was that

9

the Consulting Agreement would not have garnered the approval of Dunkin Donuts, and, to the extent that it purported to vest Dharia with an ownership interest and continued involvement in the Howard Beach Store, was expressly prohibited by the 2001 Settlement.

The Defendants also appear to allege that Dharia made affirmative misrepresentations that were designed to fraudulently induce A. Gandhi's performance under the Consulting Agreement. For example, at the same time he was withholding from A. Gandhi copies of the Consulting Agreement, Dharia allegedly misrepresented to her that he was entitled to a continuing share of the profits due to past investments in the Howard Beach Store and a continued ownership interest in RMT.

The Movants contend that these claims are barred by the applicable six-year statute of limitations.

Under New York law, the statute of limitations for common law fraud is the longer of: (1) six years from when the cause of action accrued; or (2) two years from the time plaintiff discovered the fraud, or, with reasonable diligence, could have discovered it. *See* CPLR § 213(8); *Cruden v. Bank of New York*, 957 F.2d 961, 973 (2d Cir. 1992).

In this case, the Movants contend that any potential fraud-based claim accrued more than six years prior to the filing of the Third-Party Complaint, namely, in 2002, when the Consulting Agreement was executed, or in 2004, when the fraudulently-induced profit payments began flowing to Dharia. Therefore, the Movants argue that these claims are untimely, as a matter of law.

In opposition, the Defendants rely on the statute's "discovery rule," which, as noted above, operates to toll the limitations period for two years from the date the Defendants discovered the fraud, or, with reasonable diligence, could have discovered it. In this regard, the Defendants argue that, due to Dharia's concealment of the relevant documents and obfuscation of the material facts, they did not discover the fraudulent conduct until this lawsuit was commenced against them in October 2015. The Court disagrees.

"To determine when the fraud was or should have been discovered, New York courts apply an objective test. If the circumstances of the alleged fraud would 'suggest to a person of ordinary intelligence the probability that he has been defrauded, a duty of inquiry arises . . .'" *Cruden*, 957 F.2d at 973 (quoting *Armstrong v. McAlpin*, 699 F.2d 79, 88 (2d Cir. 1983)). "When a plaintiff 'shuts his eyes to the facts which call for investigation, knowledge of the fraud will be imputed to him.'" *Id.* (quoting *Armstrong*, 699 F.2d at 88).

"'[W]hile it is true that New York courts will not grant a motion to dismiss a fraud claim where the plaintiff's knowledge is disputed, it is proper under New York law to dismiss a fraud claim on a motion to dismiss pursuant to the two-year discovery rule when the alleged facts do establish that a duty of inquiry existed and that an inquiry was not pursued.'" *Baiul v. William Morris Agency, LLC*, 13-cv-8683, 2014 U.S. Dist. LEXIS 62633, at *27 (S.D.N.Y. May 6, 2014) (quoting *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 156-57 (2d Cir. 2012)), *aff'd*, 601 F. App'x 58 (2d Cir. 2015).

Applying these standards, and construing the facts in favor of the Defendants, the Court finds that inquiry notice of the alleged fraudulent conduct existed as early as January 2002. In reaching this conclusion, the Court relies on the following alleged facts, which, in the Court's view, would have suggested to a person of ordinary intelligence that they were being defrauded.

In September 2000, at a time when Dharia and A. Gandhi co-owned RMT and jointly operated the Howard Beach Store, Dunkin Donuts sued Dharia to terminate his involvement in the corporate franchise system. A year later, in November 2001, Dharia formally agreed to divest himself of any existing ownership interests he had in Dunkin Donuts franchises, and to refrain from acquiring or maintaining any similar interest in the future.

The Defendants do not specifically allege whether they had knowledge of these facts at the time, but the Court finds it implausible to suggest that A. Gandhi, as Dharia's cousin and business

11

partner, was unaware that the upshot of the 2001 Settlement was Dharia's exclusion from the Howard Beach Store, and the Dunkin Donuts' franchise system.

Further, almost immediately following these events, Dharia, while still a minority owner of RMT, caused his attorneys to prepare a Consulting Agreement between RMT and Mantiff, a corporation which, as noted, he controlled. The transaction provided for Dharia to remain involved in, and receive compensation by way of his usual share of the profits from the Howard Beach Store. Further, by its terms, the effective date of the Consulting Agreement was deferred to coincide with the anticipated transfer of Dharia's ownership interest in RMT, ensuring that his receipt of the financial benefits of a Dunkin Donuts franchisee would continue uninterrupted.

Even assuming that Dharia failed to explicitly advise A. Gandhi that the Consulting Agreement was intended to circumvent the 2001 Settlement, in the Court's view, the material terms of that agreement were more than sufficient to put a person of ordinary intelligence on inquiry notice of the facts supporting a fraud claim.

In this regard, the Court notes that A. Gandhi was apparently a sophisticated businesswoman. At all relevant times she was either a majority shareholder or the sole owner of RMT, presumably possessing the sole capacity to bind RMT to obligations like those contained in the Consulting Agreement. In this capacity, even after Dharia yielded his minority interest in RMT, A. Gandhi continued operating the evidently profitable Howard Beach Store, and negotiated subsequent extensions of the franchise agreement and the underlying ground lease through the year 2029. Yet, throughout her negotiations with the corporate franchisor, she never disclosed that half of the franchise's profits continued flowing to someone who had been expressly barred from participation in the franchise system, or that this same individual was providing consulting services to the Howard Beach Store.

At the heart of the Third-Party Complaint are allegations that A. Gandhi was duped into signing the Consulting Agreement; that she did not even read it, let alone understand its interplay

with the 2001 Settlement; that she was subsequently denied copies of the fully-executed document; and that she believed her cousin to be too trustworthy to engage in such potentially fraudulent tactics.

However, assuming these facts to be true, whether A. Gandhi truly trusted in her cousin's honesty to the point of exercising poor business judgment is not crucial. The question for the Court is an objective one: whether someone of average intelligence in A. Gandhi's position would have been alerted to the fact that Dharia was defrauding her in January 2002. Under these circumstances, the Court answers that question in the affirmative.

Further, even if the Court accepts as true the Defendants' allegations that A. Gandhi was genuinely unaware of the situation because Dharia induced her to execute the Consulting Agreement under false pretenses; falsely represented that he was entitled to continuing profits as an owner and investor in the Howard Beach Store; and obstructed A. Gandhi's ability to confirm the true state of affairs by refusing to provide her with copies of the Consulting Agreement and other corporate records, the Court's ultimate conclusion, namely, that the fraud claims are untimely, is unaltered.

By the Defendants' own account, notwithstanding all of Dharia's prior alleged misconduct, on April 4, 2013, A. Gandhi received and reviewed the Consulting Agreement. It was on or about this date that the Defendants, apparently for the first time, grasped the reality of the situation and discontinued all payments to Dharia. Thus, in the Court's view, the Defendants had actual knowledge on that date that they potentially possessed a viable fraud-based claim, which is sufficient to trigger the two-year limitations period under the discovery rule. That two-year period expired on April 4, 2015, approximately eight months before the Defendants filed their Third-Party Complaint.

For substantially the same reasons, the Court finds that the Defendants' reliance upon the doctrine of equitable tolling also lacks merit. In particular, the Court's findings preclude the

Defendants' ability to plausibly allege several essential elements necessary to obtain such relief, including that the Defendants were unaware until October 2015 of material facts concealed by the Movants, and that they exercised due diligence to uncover their claims prior to that date. *See Miele v. Pension Plan of N.Y. State Teamsters Conf. Pension & Retirement Fund*, 72 F. Supp. 2d 88, 103-04 (E.D.N.Y. 1999) (citations omitted). On the contrary, in the Court's view, the Third-Party Complaint fails to set forth any non-conclusory allegations tending to show that the Defendants at any time exercised objectively reasonable diligence to uncover the fraud.

Therefore, regardless of whether the Defendants are deemed to have received inquiry notice of the alleged fraud in 2002 or 2013, their current claims are untimely, as a matter of law. Accordingly, the first and second causes of action based on common law fraud and fraudulent procurement of monies are dismissed.

Having so held, the Court need not reach the Movants' alternative arguments that these claims should be dismissed for failing to comply with Rule 9(b).

C. **As to Whether the Amended Complaint States a Plausible Claim Based on Unjust Enrichment**

The third cause of action in the Third-Party Complaint alleges that Dharia and Mantiff profited at the Defendants' expense by receiving payments under the Consulting Agreement to which they were not legally entitled.

Under New York law, to prevail on their claim for unjust enrichment, the Defendants must plausibly allege that: (1) Dharia and Mantiff benefitted; (2) at the expense of the Gandhis and their corporations; and (3) that equity and good conscience require the Defendants to make restitution. *See Stoltz v. Fage Dairy Processing Indus., S.A.*, No. 14-cv-3826, 2015 U.S. Dist. LEXIS 126880, at *80 (E.D.N.Y. Sept. 22, 2015) (quoting *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 586 (2d Cir. 2006)); *see also 2002 Lawrence R. Buchalter Alaska Trust v. Phila. Fin. Life Assur. Co.*, 96 F. Supp. 3d 182, 234 (S.D.N.Y. 2015) (" 'The essence of a claim for unjust enrichment is that one party

has parted with money or a benefit that has been received by another at the expense of the first party' " (quoting *Bazak Int'l Corp. v. Tarrant Apparel Grp.*, 347 F. Supp. 1, 4 (S.D.N.Y. 2004)).

"Quasi-contract claims such as unjust enrichment, however, 'only appl[y] in the absence of an express agreement.' " *Acevedo v. Citibank, N.A.*, No. 10-cv-8030, 2012 U.S. Dist. LEXIS 40242, at *39 (S.D.N.Y. Mar. 23, 2012) (quoting *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 507 (2d Cir. 2009)); *see Anwar v. Fairfield Greenwich, Ltd.*, 728 F. Supp. 2d 372, 421 (S.D.N.Y. 2010) (noting that "to the extent that a valid contract governs the transaction between the Plaintiffs and any of the Defendants, recovery in unjust enrichment is not allowed" (citing *EBC I, Inc. v. Goldman Sachs & Co.*, 5 N.Y.3d 11, 23, 832, N.E.2d 26, 799 N.Y.S.2d 170 (2005)).

In this case, the Movants argue that the Defendants' third cause of action based on unjust enrichment fails, as a matter of law, because a valid contract, namely, the Consulting Agreement, governs the subject matter of the claim. The Court disagrees.

Initially, it is noted that neither party submitted the Consulting Agreement for the Court's review. Therefore, the Court is unable to ascertain whether the contract fully governs the subject matter of their dispute.

Nevertheless, the Movants' argument presupposes the validity of the Consulting Agreement, without regard for the well-pled allegations in the Third-Party Complaint tending to show that the contract may, in actuality, be unenforceable. In particular, the Court notes that, although the Defendants' third-party claims sounding in fraud are time-barred, the Defendants are not precluded from establishing through discovery that the Consulting Agreement was a fraudulently conceived document without legal effect. *See Anwar*, 728 F. Supp. 2d at 421 (noting that a claim of unjust enrichment will be warranted "if . . . the evidence reveals that no valid contract governed the relationship between the Plaintiffs and each of these defendants"); *Kottler v. Deutsche Bank AG*, 607 F. Supp. 2d 447, 468 (S.D.N.Y. 2009) (finding dismissal of a claim based on unjust enrichment to be

inappropriate where a dispute existed as to whether the contract in question completely covered the parties' dispute, and more specifically, "whether the Plaintiffs were induced to enter into the agreements as a result of fraud").

In the Court's view, if adequately proven, the allegations of fraudulent inducement to contract, outlined above, could support the conclusion that the parties' relationship was not, in fact, governed by a valid contract. *See, e.g., Trs. of the ALA-Lithographic Pension Plan v. Crestwood Printing Corp.*, 127 F. Supp. 2d 475, 480 (S.D.N.Y. 2001) ("A contract is deemed void 'where there is a misrepresentation as to the character or essential terms of a proposed contract, and a party signs without knowing or having a reasonable opportunity to know of its character or essential terms'" (quoting *Hetchkop v. Woodlawn at Grassmere, Inc.*, 116 F.3d 28 (2d Cir. 1997)).

Under these circumstances, it is too early to tell whether equity and good conscience may require Dharia and Mantiff to disgorge the profits they received under the Consulting Agreement. *See Kottler*, 607 F. Supp. 2d at 468 (noting that " 'where there is a bona fide dispute as to the existence of a contract or where the contract does not cover the dispute in issue,' a court should not dismiss a claim of unjust enrichment at the motion-to-dismiss stage").

Accordingly, the Movants' motion to dismiss the Defendants' third cause of action based on unjust enrichment is denied.

D.     As to Whether the Third-Party Complaint States a Plausible Claim Based on "Failure to Repay Monies Admittedly Owed"

The fourth cause of action in the Third-Party Complaint alleges that Dharia failed to repay the $350,000 loan that the Gandhis allegedly gave to him in the form of investments in various business ventures. They allege that, because he acknowledged his indebtedness, he is liable for "failure to repay monies admittedly owed."

The Movants contend that dismissal is appropriate because no such cause of action exists in the law. The Court agrees.

16

In opposition, the Defendants cite to a single case, *M&R Rockaway, LLC v. SK Rockaway Real Estate Co.*, 74 A.D.3d 759, 902 N.Y.S.2d 621 (2d Dep't 2010), which involved a claim sounding in breach of contract, and did not, as they contend, recognize a distinct cause of action entitled "failure to repay monies admittedly owed." The Court's independent research has similarly failed to uncover any precedent for judicial recognition of such a claim.

In any event, the Court concurs with the Movants' alternative argument that, even construing this claim liberally to state a claim for an arguably analogous cause of action, such as promissory note default or breach of contract, any such claim is untimely, as a matter of law.

As noted above, the Third-Party Complaint alleges that the loan in question, which, apparently, was accompanied by a promise of repayment, was made in 2003. The Defendants further allege that they began demanding repayment in 2004, to no avail. Finally, they allege that in or about 2007 Dharia acknowledged his indebtedness and proposed an arrangement whereby his share of the profits of the Howard Beach Store would be applied to incrementally satisfy his debt.

"In New York, a cause of action for breach of contract accrues, and the six-year statute of limitations (CPLR § 213(2)) commences, when the contract is breached." *City of New York v. Black & Veatch*, No. 95-cv-1299, 1997 U.S. Dist. LEXIS 15510, at *38-*39 (S.D.N.Y. Oct. 6, 1997) (citing *T&N PLC v. Fred S. James & Co. of New York, Inc.*, 29 F.3d 57, 59 (2d Cir. 1994)). Even assuming that the breach occurred on the latest complained-of date, namely, 2007, the statute of limitations expired in 2013.

Similarly, "the statute of limitations for a claim to recover on a promissory note is [also] six [ ] years," running from "the time of its execution." *Don Lia v. Saporito*, 909 F. Supp. 2d 149 (E.D.N.Y. 2012) (citations omitted), *aff'd*, 2013 U.S. App. LEXIS 20975 (2d Cir. Oct. 17, 2013). There is no debate that Dharia allegedly promised to repay the loan in 2003, meaning that any cognizable cause of action arising from that promise expired in 2009.

17

Accordingly, the Defendants' fourth cause of action based on a "failure to repay monies allegedly owed" is dismissed.

E.  **As to Whether the Third-Party Complaint States a Plausible Basis for Relief Against Yesa LLC**

The final question for the Court is whether the Third-Party Complaint states a plausible basis for relief against the Plaintiff Yesa.

As noted above, the Third-Party Complaint is formally styled an "Answer[,] . . . Affirmative Defenses, Counterclaim, and Third-Party Complaint." Thus, the various causes of action, outlined above, are not only asserted in the form of third-party claims against the Third-Party Defendants, but also in the form of counterclaims against Yesa. The document expressly purports to seek relief against Yesa in the *ad damnum* clause.

However, the Movants contend that the third-party pleading fails to make any substantive allegations against Yesa that would be sufficient to survive scrutiny under Rule 12(b)(6). Rather, the Movants argue that the Defendants simply seek to impute liability to Yesa based on actions allegedly taken by Mantiff and/or Dharia. The Court disagrees.

The Third-Party Complaint expressly alleges that Dharia is the managing member of Yesa and the majority shareholder of Mantiff; that Dharia caused his attorneys to prepare the allegedly fraudulent Consulting Agreement between RMT and Mantiff; that he concealed the true nature of the Consulting Agreement from A. Gandhi; that he also affirmatively misrepresented his entitlement to a continuing share of the profits of the Howard Beach Store; that in 2007, he unilaterally assigned Mantiff's right to payment under the Consulting Agreement to Yesa; and that, during the 2010, 2011, and 2012 tax years, the allegedly fraudulently-induced profit payments were, in fact, directed to, and received by Yesa. This latter fact is corroborated by the copies of the Form 1099s annexed to the Main Complaint.

18

Therefore, with respect to the Defendants' only remaining claim, namely, the third cause of action based on unjust enrichment, the Court finds that a sufficient factual basis exists to make it plausible that Yesa unjustly received monies, namely, some of the profit payments made pursuant to the Consulting Agreement, at the expense of the Defendants. In fact, the Court finds that this fact is all but conceded by Yesa's characterization of itself as the "successor in interest" to Mantiff, namely, the payee under the contract.

Under these circumstances, the Court finds that dismissal of the Third-Party Complaint against Yesa is unwarranted at this time.

### III.   CONCLUSION

Based on the foregoing, the Court is granting in part and denying in part the Movants' motion to dismiss the Third-Party Complaint.

In particular, the Court is dismissing the first, second, and fourth causes of action as time-barred. However, the motion is denied as to the third cause of action based on unjust enrichment.

Further, the Court finds that the Defendants may properly seek to recover on a theory of unjust enrichment against the Third-Party Defendants, as well as the Plaintiff Yesa LLC.

This matter is respectfully referred to United States Magistrate Judge Steven I. Locke for discovery.

It is **SO ORDERED:**

Dated: Central Islip, New York
October 28, 2016          */s/ Arthur D. Spatt*
                          ARTHUR D. SPATT
                          United States District Judge